UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

In re:

Great Southern Galvanizing, LLC d/b/a

Great States Galvanizing,

Case No. 18-10259

Debtor

Chapter 11

**AMENDED** ORDER (A) AUTHORIZING AND APPROVING AUCTION
PROCEDURES TO BE EMPLOYED IN CONNECTION WITH THE
PROPOSED SALE OF THE DEBTOR'S ASSETS, AND SCHEDULING AN
AUCTION AND SALE HEARING, (B) AUTHORIZING AND APPROVING
ASSIGNMENT PROCEDURES, AND (C) APPROVING THE MANNER AND
FORM OF NOTICE OF THE AUCTION AND ASSIGNMENT PROCEDURES

CONSIDERING the motion [P-7] of debtor-in-possession Great Southern Galvanizing,

LLC, the agreement of counsel to secured creditors Iberiabank and Penske, and for reasons orally

assigned at an April 9, 2018 hearing;

IT IS ORDERED that:

1.      Unless otherwise ordered by the Court, the following procedures (the "Auction

Procedures") shall govern the bidding and sale of the Debtor's assets:

   a.  Due Diligence.  Upon execution of a confidentiality agreement, any prospective
       bidder that wishes to investigate the Debtor's assets shall be granted access to all
       material information provided for prospective bidders.  The due diligence period for
       bidders will end at five o'clock p.m. (5 p.m.) central time one business day prior to
       the Bid Deadline (as defined in this order).  The Debtor shall coordinate all
       reasonable requests for additional information and access from potential bidders.  No
       conditions relating to the completion of due diligence shall be permitted to exist after
       the Bid Deadline.  The Purchased Assets shall be sold on an "as is, where is" basis
       and by submitting a bid, each potential bidder so acknowledges.

   b.  Qualified Bids.  In order to be eligible to participate in an auction of the Debtor's
       assets, each potential bidder shall, on or before June 8, 2018, (the "Bid Deadline"),
       deliver a bid to the Debtor's counsel via email to Paul Douglas Stewart, Jr.,
       dstewart@stewartrobbins.com, and to counsel for Iberiabank, via email to Craig A.
       Ryan, ryanc@onebane.com, that shall be considered a qualified bid (a "Qualified

Bid") if the bidder (a "Qualified Bidder") complies with, and such Qualified Bid contains all, of the following:

i. If not previously completed, an executed confidentiality agreement in a form reasonably satisfactory to the Debtor, which shall include appropriate and customary protections associated with confidential and proprietary information;

ii. A cash deposit of $50,000.00 (the "Deposit"), which will be held by the Debtor's counsel in its client trust account with no interest due to the bidder, as a refundable deposit for application against the purchase price at the closing of the transaction, or to be returned to the bidder within five (5) business days following conclusion of the auction, unless the bidder is the highest and best bidder (the "Successful Bidder") or the next highest and best bidder (the "Backup Bidder"), whose Deposits shall be held as set forth below;

iii. An executed asset purchase agreement either (i) in the form attached to this order as Exhibit "A" or (ii) in a different form which must be marked against the suggested form, showing amendments and other modifications (including price and other terms) proposed (the "Asset Purchase Agreement") which must:

1. specify the amount of cash offered by the bidder for the Purchased Assets;

2. specify which of the Purchased Assets the bidder desires to bid upon;

3. constitute an irrevocable offer by the bidder (a) to complete its proposed purchase upon its terms, and (b) to remain irrevocable until the closing of the Sale of the Purchased Assets;

4. include documentation demonstrating the authority of the bidder to submit an offer to purchase the Purchased Assets that identifies the officer(s) or authorized agent(s) appearing on behalf of the bidder;

5. include information demonstrating that the bidder has the financial wherewithal to close the transaction;

6. acknowledge that it will not be entitled to a break-up fee, termination fee, expenses, or substantial contribution claim of any type; and

7. contain such other information reasonably requested by the Debtor.

iv. Those parties that submit the information required above will be notified within 24 hours as to whether the information submitted is satisfactory and whether the party is now a Qualified Bidder.  If the Debtor or Iberiabank is not satisfied with the information received from the interested party, the

Debtor may seek further information to qualify the party as a Qualified Bidder.

c. Qualified Bidders.  The Debtor, in consultation with Iberiabank, shall determine whether a bid qualifies as a Qualified Bid.  Subject to the reservation of credit bid rights in subparagraph (j) of this Section 1, unless otherwise decided by the Debtor and Iberiabank, only those persons (other than Iberiabank) who have submitted a Qualified Bid in compliance with this Auction Procedures Order shall be a Qualified Bidder. Iberiabank shall be deemed a Qualified Bidder for all purposes hereunder and shall not be required to comply with the provisions of subparagraph b hereinabove. Iberiabank and/or any party who has credit bid rights under subparagraph (j) is not required to submit a bid before the Bid deadline and Iberiabank and/or such entity or person having rights under subparagraph (j) of this Section 3 shall have the right to submit a credit bid at the Auction, which shall be deemed equivalent to a cash bid. In the event that Iberiabank is the Successful Bidder,  Iberiabank and shall retain any and all rights and claims it has or may have against the Debtor, any guarantor or any remaining collateral with respect to amounts owed to Iberiabank after application of the sale proceeds (or the credit bid amount) to Iberiabank's claim, including the right to pursue any guarantor on the deficiency and / or the right to file an amended proof of claim into this bankruptcy case.

d. One Qualified Bid.  In the event the Debtor only receives a single Qualified Bid and Iberiabank does not credit bid at the Auction Date / Sale Hearing, there shall be no auction and at the Sale Hearing the Debtor shall request that the Bankruptcy Court approve the Sale of the Purchased Assets to the Qualified Bidder through the Sale Order and rule that the Sale Order be immediately effective upon entry.

e. The Auction.  In the event the Debtor receives one or more Qualified Bids and / or Iberiabank places a credit bid at the Auction, an Auction shall commence June 18, 2018, at 2:00 p.m., in open court. Each Qualified Bidder (including Iberiabank, if applicable) shall be invited to attend the Auction which must be attended in person. The following rules shall govern the Auction:

   i. Subject to the limitations set forth in these Auction Procedures, the opening price at such Auction shall be the highest and/or best offer of a Qualified Bidder selected and announced by the Debtor at the commencement of the Auction;

   ii. Only Qualified Bidders may bid at the Auction.  If multiple Qualified Bids are received, each Qualified Bidder shall have the right to continue to improve its Qualified Bid at the Auction;

   iii. Each subsequent overbid must provide an incremental amount designated by the Debtor;

   iv. Each bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction;

    v.   The Auction shall be conducted openly, and each bidder will be informed of the terms of the previous bid determined by the Debtor and Iberiabank to have been the highest and otherwise best bid;

    vi.  At the conclusion of the Auction and subject to Court approval following the Auction, the Debtor shall announce as the highest or otherwise best bid for the Purchased Assets the Successful Bidder as well as the second highest or otherwise best bid for the Purchased Assets, the Backup Bidder;

    vii. The Auction may be adjourned by the Debtor and Iberiabank from time to time without further notice other than an announcement of such adjournment by the Debtor at the Auction;

    viii.   Upon the conclusion of the Auction, the Debtor will request that the Court enter the Sale Order approving the sale of the Purchased Assets to the Successful Bidder, or, should the Successful Bidder fail to close the sale, the Backup Bidder; free and clear of all liens, claims and encumbrances to the fullest extent allowed under section 363(f) of the Bankruptcy Code; and

    ix.  Notwithstanding the foregoing, the Debtor may, with the concurrence of Iberiabank, promulgate such additional rules for the Auction as the Debtor, in its reasonable discretion, deems to be in the best interests of the Debtor's estate.

f.   Successful Bidder.  The Debtor, in consultation with Iberiabank, shall select the highest and best bid as the Successful Bidder. The Debtor and / or Iberiabank may (a) reject any bid that is (i) inadequate or insufficient , (ii) not in conformity with the requirements of the Bankruptcy Code, the Auction Procedures or the terms and conditions of sale, or (iii) contrary to the best interests of Debtor, its estate and creditors, and (b) refuse to consider any bid that fails to comply with the Auction Procedures. After the determination of the Successful Bidder, the Debtor shall promptly execute the asset purchase agreement previously executed and submitted by such Successful Bidder, together with any changes thereto necessitated by the parties' actions at the Auction.

g.   Backup Bidder.  If the Successful Bidder fails to consummate the sale, breaches the asset purchase agreement executed by the Successful Bidder or otherwise fails to perform, (a) the Debtor may consummate the proposed sale with the next highest or best bidder at the Auction (i.e., the Backup Bidder), without the need for further Court approval, (b) the Debtor will retain the Deposit of such bidder, and (c) the Debtor will maintain the right to pursue all available remedies against the Successful and Backup Bidders.

h.  Purchase by Iberiabank. In the event that no Qualified Bids are received by the Bid Deadline; or if the Successful Bidder and the Backup Bidder (if applicable) shall fail to consummate the proposed sale as provided for hereinabove, the Debtor may consummate the proposed sale to Iberiabank, and any other entity having rights to credit bid for certain assets as reserved under subparagraph (j) of this Section 3, pursuant to credit bid with the credit amount or purchase price of the Purchased Assets to be agreed upon at the Sale Hearing, and with the Debtor maintaining the right to pursue all available remedies against the Successful and Backup Bidders. Iberiabank shall retain any and all rights and claims it has or may have against the Debtor, any guarantor or any remaining collateral with respect to amounts owed to Iberiabank after application of the sale proceeds (or the credit bid amount) to Iberiabank's claim, including the right to pursue any guarantor on the deficiency and / or the right to file an amended proof of claim into this bankruptcy case.

i.  Deposits.  All Deposits (without interest) shall be returned to each bidder not selected by the Debtor as the Successful Bidder or Backup Bidder no later than five (5) business days following the conclusion of the Auction.  The Deposit (without interest) of the Backup Bidder shall be returned to the Backup Bidder no later than 72 hours after the closing of the transaction.  If the Successful Bidder timely closes the transaction (within 15 days after the Sale Hearing unless extended by consent of the Debtor and Iberiabank), its Deposit (without interest shall be credited towards the Purchase Price.  If the Successful Bidder fails to timely close the transaction, and the Purchased Assets are sold to the Backup Bidder, such Backup Bidder's Deposit (without interest) shall be credited towards the Purchase Price.

j.  Credit Bid.  Credit Bidding is allowed for secured creditors with claims allowed under Bankruptcy Code section 502. Putative creditors Hobson Galvanizing, Inc., Westside Galvanizing Services, Inc. and AZZ Inc. will not be allowed to credit bid their recorded judgment as an adversary proceeding has been filed to avoid the recordation and perfection of their judicial lien.

k.  Exercise of Iberiabank's Section 363(f) Objection Right.  Iberiabank must declare whether it objects to this sale under Section 363(f) (i) immediately upon the conclusion of the Auction, if any, or (ii) within four (4) hours of the Bid Deadline if only one (1) bid is received.  If Iberiabank declares that it objects to this sale under Section 363(f), (i) the Sale Motion will be continued for fourteen (14) days in order to allow any party in interest to seek to have the sale approved over Iberiabank's objection and (ii) such parties shall have (7) days to file a pleading seeking such relief.  Absent such a filing, the Sale Hearing will be cancelled.

l.  Fees and Expenses.  All bidders submitting bids shall bear their own fees and expenses in connection with the bid, the bid process, the Auction and the proposed sale, whether or not such sale is ultimately approved, unless otherwise agreed to by the Debtor and approved by the Court.

2.  The hearing on the sale (the "Sale Hearing") shall be held on **June 18, 2018, at**

**2:00 p.m. (Central Time)**, or as soon thereafter as counsel may be heard, before the Honorable

Douglas D. Dodd, United States Bankruptcy Judge for the Middle District of Louisiana. At the

Sale Hearing, the Debtor will seek entry of the Sale Order. The Sale Hearing may be adjourned

from time to time without further notice other than an announcement by the Debtor in Court on

the date scheduled for the Sale Hearing.

3. The form of notices attached to this order as exhibits B and C are approved. The

Debtor shall serve conformed notices within two (2) business days (by first class mail, postage

prepaid) after entry of this order on the following parties: (i) all parties on the Debtor's mailing

list, (ii) all parties having requested notice, (iii) counsel to any official committee, (iv) the Office

of the United States Trustee, (v) counsel to all secured lenders, (vi) all parties that assert a lien or

other encumbrance against any of the assets noticed for sale, (vii) all parties to executory

contracts and unexpired leases proposed to be assumed and assigned, or rejected, as part of the

proposed transaction, and (viii) all entities known or reasonably believed to have expressed an

interest in acquiring any of the assets offered for sale.

4. Responses or objections, if any, to the entry of the Sale Order shall be filed with

this Court as required by local rule.

5. The following Assignment Procedures shall govern the assumption and

assignment of executory contracts and leases in connection with the sale to the Successful

Bidder:

> i. Not later than fourteen (14) days prior to the Sale Hearing, the Debtor shall
> file with the Court a list (the "Cure Schedule") identifying such contracts and
> leases which may be assumed in connection with the sale and the amounts
> necessary to cure defaults and/or provide compensation or adequate assurance
> of compensation for actual pecuniary loss resulting from a default at the time
> of assumption as determined by the Debtor (such amounts, "Cure Payment
> Liability"). The Debtor shall serve all counterparties to such contracts and
> leases with the Assignment Notice, specifically stating that the Debtor is or
> may be seeking the sale, assumption and assignment of such contracts and
> leases and notifying such parties of the deadline for objecting (a

"Cure/Assignment Objection") to the amount of any related Cure Payment Liability, which deadline shall be three (3) business days prior to the Sale Hearing, so as to enable any such party to object to the proposed Cure Payment Liability and the Court to determine such Cure Payment Liability as promptly as is reasonably possible.

ii.   In cases in which the Debtor is unable to establish that a default exists, the relevant Cure Payment Liability shall be set at $0.00 in the Assignment Notice.

iii.   Notwithstanding anything herein to the contrary, the Debtor may, from time to time, modify the Cure Schedule to add or remove a contract or lease counterparty or to modify the proposed Cure Payment Liability with respect to any counterparty.  The non-debtor counterparty to any such contract or lease will be provided written notice of any such modification and at least fourteen (14) days advance notice of its deadline to object to such modification, and the Debtor will seek to set any such objection for hearing before the Court as promptly as is reasonably possible.

This order shall be immediately effective and enforceable upon its entry.

Baton Rouge, Louisiana, April 11, 2018.

**<u>s/ Douglas D. Dodd</u>**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE

Agreed to as to form and substance:

Respectfully Submitted,
Stewart Robbins & Brown LLC
P. O. Box 2348
301 Main Street; Suite 1640 (70801)
Baton Rouge, LA 70821-2348
(225) 231-9998 Telephone
(225) 709-9467 Fax

By:   /s/Paul Douglas Stewart, Jr.____
Paul Douglas Stewart, Jr. (La. #24661)
dstewart@stewartrobbins.com

Counsel to debtor-in-possession

-- and --

Onebane Law Firm

1200 Camellia Boulevard Suite 300
Lafayette, Louisiana 70508
Telephone - 337-237-2660
Fax - 337-266-1232

By:    /s/Craig A. Ryan_____
       Craig A. Ryan
       E-mail - ryanc@onebane.com

       Counsel to Iberiabank

# EXHIBIT A – AUCTION PROCEDURES ORDER

# PROPOSED ASSET PURCHASE AGREEMENT

## **PURCHASE AGREEMENT**

THIS PURCHASE AGREEMENT (the "Agreement") is entered into on or as of this _____ day of _____, 2018 (the "Effective Date"), by and between **Great Southern Galvanizing, LLC,** Chapter 11 Debtor-in-possession, Case No. 18-10259 ("**GSG**" or "**Seller**, and _____[**INSERT company name**], a _____[**INSERT origin state and type of entity**] (the "Purchaser").

Recitals

A.   Seller filed Chapter 11 bankruptcy in the United States Bankruptcy Court, Middle District of Louisiana, Case No. 18-10259 on March 14, 2018 ("Bankruptcy Case").

B.   Seller is the owner of certain real property as described in Exhibit "A" hereto, together with all improvements located thereon, together with certain servitudes, easements and rights of way related to same (collectively, the "Immovable Property").

C.   Seller is the owner of certain movable property ("Movable Property") including without limitation, that movable property described in Exhibit "B", together with Seller's inventory, accounts receivable (as of the date of the Closing as hereinafter described) and other movable assets.  The Immovable Property and the Movable Property are sometimes referred to herein collectively as the "Property."

D.   Purchaser desires to purchase the Property pursuant to the terms and conditions of this Agreement.

Agreement

NOW, THEREFORE, in consideration of the above Recitals and other good and valuable consideration, including the mutual covenants and promises herein contained, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.    Agreement to Sell.  For the consideration set forth in Paragraph 2 below, Seller hereby agree to grant, bargain, sell, assign and convey to Purchaser, the Property, with good and merchantable title, free and clear of all liens, mortgages, debts, obligations, taxes or any other burdens.

2.    Purchase Price; Deposit

(a) (i) Property to be Purchased.  Purchaser desires to purchase the Property as indicated below (hereinafter, the term "Property" shall describe the Property described below):

| Amount of Offer | Property |
|---|---|
| $ | All Immovable Property and Movable Property |

| $ | Only Immovable Property |
|---|---|
| $ | Only Movable Property |
| $ | Only the following described Property: |

(a)(ii)  <u>Purchase Price</u>.  The total purchase price for the Property ("Purchase Price") shall be _____ ($_____) Dollars, Total, all to be paid as hereinafter provided.  The closing of the sale and purchase of the Property (the "Closing") shall occur on the Closing Date, as defined in Paragraph 8.

(b)  Allocation of Purchase Price.  The parties covenant and agree that the Purchase Price shall be allocated among the Property in accordance with Section 1060 of the Internal Revenue Code of 1986, as determined by Seller.  The parties hereto agree to report this transaction for federal and state tax purposes in accordance with the foregoing.

(c)  Deposit.  Purchaser has delivered to the Seller funds in the amount of Fifty Thousand ($50,000.00) Dollars (the "Deposit"), to be held and disbursed pursuant to this agreement. Said Deposit is not to be considered "earnest money".  The Deposit shall be applied to the Purchase Price upon the passing of the act of sale contemplated herein; provided, however, that in the event Purchaser defaults hereunder, at Seller's option, Seller shall be entitled to retain the Deposit or demand specific performance.  Should Purchaser fail to purchase the Property for any of the reasons set forth in Paragraph 5 below, the Deposit, together with interest, if any, shall be refunded to Purchaser and this Agreement shall terminate.

(d)  Excluded Assets.  Without limiting the foregoing, and notwithstanding anything to the contrary herein or in the Exhibits hereto, the following property is excluded from the Sale and the definition of Property herein:  all cash of Seller on the Closing Date.

(e)  Assigned Contracts and Leases.  Purchaser, at its option, will be entitled to assignment of certain contracts and leases under those Assignment Procedures set forth in Seller's Bankruptcy Case.   It is understood and agreed that Purchaser will be responsible for any and all sums necessary to cure defaults and/or to provide adequate assurance of compensation for actual pecuniary loss as set forth in Seller's Bankruptcy Case.  Such payments will not constitute any portion of the Purchase Price for the Sale hereunder, and Seller will not receive any credit for such payments against the Purchase Price.

3.  Auction and Overbids.  It is understood and agreed that this Agreement is executed in conjunction with an auction and sale process in Seller's Bankruptcy Case.

(a)  Overbid Increase in Purchase Price.  If Purchaser, in an effort to become high bidder and acquire the Property submits one or more bids at the hearing on the approval on the sale contemplated herein ("Sale Hearing") in excess of the Purchase Price set forth herein,

the Purchase Price for the Property shall be automatically increased and shall be the amount of the highest, final, approved bid submitted, and the Purchase Price for the Property shall be deemed increased to reflect the highest, final, approved bid. Purchaser's right to participate in the Sale Hearing(s) and the terms applicable thereto shall be set forth in the Auction Procedures Order (defined below).

    (b)     <u>Bid Process; Competitive Bids</u>.

    i.     <u>Bankruptcy Court Matters</u>. Seller has or will file a motion with the Bankruptcy Court seeking an order regarding the Auction Procedures to be used in connection with the Sale Hearing and approving this form of Purchase and Sale Agreement, and related Auction Procedures (set forth in Exhibit C, hereto, the "Auction Procedures") (such order is referred to herein as the "Auction Procedures Order").  It is acknowledged that the Auction Procedures Order provides certain rights to Seller's secured creditor, Iberiabank, including without limitation, the right to share in determination of qualified bidders and the highest and best bidder, certain objection rights to any proposed sale of the Property, the right to credit bid against any other bidders, and an exemption from bid qualification procedures.

    ii.     <u>Compliance with Auction Procedures</u>. At the time of delivery of the mutual execution of this Agreement, Purchaser shall have complied with all of the Auction Procedures (as the same may have been amended) necessary to be deemed a Qualified Bidder, and its bid a Qualified Bid (as those terms are defined in the Auction Procedures), including, but not limited to (a) an executed confidentiality agreement, (b) provide a 10% deposit that remains non-refundable through the closing of the sale if they are selected as the Successful or Back-up Bidder, and (c) a copy of a board resolution or similar document demonstrating the authority of the Purchaser to submit an offer to purchase the Purchased Assets on the terms proposed by such the bidder and identifies the officer(s) or authorized agent(s) appearing on behalf of the Purchaser.  Execution of this Agreement reflects an acknowledgement by Purchaser that it will not be entitled to a break-up fee, termination fee, expenses, or substantial contribution claim of any type.

    iii.     <u>Sale Hearing</u>. The Bankruptcy Court may hold the Sale, at which the Bankruptcy Court shall, among other things, preside over any overbidding for the Property, as well as review and approve the Seller's selection of Successful Bidder (and the Back-Up Bidder, if any).  Successful Bidder means the bidder at the Sale Hearing who submits an offer that Seller determines, subject to Bankruptcy Court approval, is the highest or best offer from among the bids submitted at the Sale Hearing.  At that hearing, the Seller will seek an order confirming the sale of the to the Successful Bidder (and the Back-Up Bidder, if any) (the "Sale Order"). Seller and

Purchaser (if and to the extent Purchaser is the Successful Bidder) shall use commercially reasonable efforts to obtain the Sale Order from the Bankruptcy Court.

iv.     <u>Appeal</u>. In the event the entry of the Sale Order shall be appealed, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal. Notwithstanding anything to the contrary set forth herein, Purchaser shall not be obligated to defend any appeal and may elect to terminate this Agreement if the Bankruptcy Court stays the Closing hereunder for a period exceeding twenty-five (25) days from the date of entry of the Sale Order. If Purchaser elects to terminate this Agreement following an appeal and subsequent stay of Closing exceeding twenty five (25) days, Purchaser shall receive a full refund of the Deposit and Purchaser shall be released of all its duties and obligations hereunder.

v.     <u>Competing Bids</u>. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a "Competing Bid"). From the date hereof (and any prior time) and until the transaction contemplated by this Agreement is consummated, Seller is permitted, through his broker or other means, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Purchaser) in connection with any sale or other disposition of the Property. In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase the Property and perform any and all other acts related thereto that are required under applicable law, including supplying information relating to the Property to prospective purchasers. The Parties agree that Seller shall be entitled to consider and enter into one or more transactions in connection with a Competing Bid consistent with his fiduciary obligations in the Bankruptcy Case. Purchaser acknowledges that this Agreement is the culmination of an extensive process undertaken by Seller to identify and negotiate a transaction with a bidder who was prepared to pay the highest or best purchase price for the Property, among other material considerations, in order to maximize value of the Property. The Auction Procedures are designed to facilitate a full and fair process designed to maximize the value of the Property.

vi.     <u>Back-Up Bid Requirement</u>. Purchaser acknowledges and agrees that the bidder with the second highest or otherwise best bid (as determined by Seller in the exercise of its business judgment) at the Sale Hearing may serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until five (5) business days after the later of the approval of the bid or back-up bid by in the Sale Order and the Closing. In the event Purchaser is named Back-Up Bidder, Seller shall continue to hold its Deposit. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale, the Back-Up Bidder will be deemed to be

the new Successful Bidder, and Seller will be authorized, to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court. If Purchaser is the Back-Up Bidder and the Successful Bidder fails to consummate an approved sale, then Seller may, without further order of the Bankruptcy Court, consummate the sale with Purchaser; provided, however, that Purchaser is not otherwise in default. For purposes of this Section, Purchaser shall be deemed a bidder and this Agreement shall be deemed a bid.

vii.    <u>Irrevocability</u>.   Purchaser acknowledges that its bid and obligation to purchase the Property hereunder is irrevocable until the Closing.

4.     <u>Right of Inspection</u>.   Upon full execution of this Agreement, Purchaser acknowledges and agrees that it has already been afforded the right to conduct any inspections of the Property deemed advisable, and is satisfied with the results of same

5.     <u>Application of Deposit or Refund.</u> The Deposit shall be applied to the Purchase Price to be paid by Purchaser at Closing.   Upon Purchaser's request, the Deposit shall be  refunded within five (5) business days upon the occurrence of any of the following:

(a)     Seller is unable to convey title to the Property or fails to cure a title defect or title objection as required under Paragraph 13 of this Agreement; or

(b)     The sale of the Property is not approved by the United States Bankruptcy Court, or the Purchaser is not selected as the Successful Bidder or Back-Up Bidder..

If the foregoing 5(a) shall occur, then the parties shall proceed as set forth in Paragraph 13.

In the event that Purchaser is selected as the Back-Up Bidder, but the sale of the Property closes with the High Bidder, then the Deposit shall be returned to Purchaser immediately with no further obligations of the parties.

6.     <u>Cooperation.</u>   Seller shall cooperate with Purchaser to facilitate access to the Property, as reasonably required by Purchaser.

7.     <u>Possession.</u>   Seller shall deliver possession of the Property (together with all necessary titles thereto) to Purchaser on the Closing Date.

8.     <u>Place and Date of Closing.</u>   The Closing shall take place through the offices of the counsel for Seller, no later than thirty (30) days following the Sale Order, unless extended for title issues as provided in Section 13, or at such other location and date as may be agreed upon by the parties hereto in writing.   The actual date of Closing is referred to herein as the "Closing Date."   Time shall be of the essence with respect to the Closing Date.

9.     <u>Conveyance.</u>

(a) Purchaser hereby acknowledges and agrees that Seller will transfer its right,

title and interest in and to the Property without any warranty or recourse whatsoever, express or implied,  not even as to the return of all or any part of the Purchase Price, and with the sole peril and risk of eviction being assumed by Purchaser, but with full substitution and subrogation in and to all of the rights and actions of warranty which Seller has or may have against all preceding owners or vendors.

(b) The Property will be sold AS IS, WHERE IS, with all faults, and without any warranties, express or implied, including but not limited to warranties of condition, fitness for a particular purpose or habitability.  Purchaser acknowledges and agrees that Seller has made no representation, warranty or guaranty, express or implied, oral or written, past, present or future, of, as to, or including: (i) the condition or state of repair of the Property, including, without limitation, any condition arising in connection with the generation, use, transportation, storage, release or disposal of hazardous substances (which includes all substances listed as such by applicable law, all pollutants or contaminants, whether harmful or not, petroleum and natural gas and their components and distillates, asbestos and naturally-occurring but harmful substances such as methane or radon) on, in, under, above, upon or in the vicinity of the Property; (ii) the quality, nature, adequacy and physical condition of the Property, including but not limited to, the presence or absence of termites or other wood destroying insects and/or any damage related thereto, and including but not limited to the structural elements, environmental issues, appurtenances, access, landscaping, parking facilities and the electrical, mechanical, plumbing, sewage, and utility systems and facilities; (iii) the quality, nature, adequacy and physical conditions of soils and geology and the existence of ground water; (iv) the existence, quality, nature, adequacy and physical conditions of utilities serving the Property; (v) the development potential of the Property, its habitability, merchantability, or the fitness, suitability or adequacy of the Property for any particular purpose; (vi) the zoning or other legal status of the Property; (vii) the Property or its operations' compliance with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions, and restrictions of any governmental or quasi-governmental entity or of any other person or entity; (viii) the quality of any labor and materials; and (ix) the nature, status and extent of any servitude, permit, right-of-way, or lease, right of redemption, possession, lien, encumbrance, license, reservation, covenant, condition, restriction, and any other matter affecting title.  Seller and Purchaser agree that the above provisions shall survive the execution of this agreement and the Closing.

Purchaser hereby acknowledges and declares that Purchaser shall rely solely on Purchaser's own examination, inspection and evaluation of the Property, and not on any warranties or representations, whether express or implied or written or oral, from Seller.  Any and all warranties, whether express or implied, with respect to the Property, including but not limited to those related to merchantability of the Property or fitness of the Property for a particular purpose, are hereby disclaimed by Seller and shall be expressly waived by Purchaser.

Purchaser hereby expressly waives and renounces any and all rights in redhibition pursuant to Louisiana Civil Code Article 2520, et seq., the warranty imposed by Louisiana Civil Code Article 2475, and Purchaser's ability to rescind the sale of the Property or seek a reduction in the Purchase Price for any reason whatsoever, and Purchaser hereby releases Seller from any and all liability whatsoever in connection therewith.

Purchaser and Seller agree that Purchaser has been afforded the opportunity to

conduct and complete such inspections of the Property and all components parts thereof as are deemed necessary or advisable by Purchaser, and by purchasing the Property Purchaser acknowledges that he has been afforded such opportunity and that he accepts the Property in its existing "AS IS" and "WHERE IS" condition and that his waiver of, and Seller's disclaimer of, express and implied warranties of title, fitness and the condition of the Property is reflected in, and is a function of, the Purchase Price.

PURCHASER HEREBY ACKNOWLEDGES THAT:  (i) THE FOREGOING WAIVERS AND DISCLAIMERS HAVE BEEN BROUGHT TO THE ATTENTION OF PURCHASER, (ii) THE FOREGOING WAIVERS AND DISCLAIMERS HAVE BEEN READ AND ARE UNDERSTOOD BY PURCHASER, (iii) THE AGREEMENT OF PURCHASER WITH AND TO ALL OF THE TERMS AND CONDITIONS OF THESE WAIVERS AND DISCLAIMERS IS AN INTEGRAL PART OF THIS AGREEMENT BETWEEN SELLER AND PURCHASER, WITHOUT WHICH THIS AGREEMENT WOULD NOT HAVE BEEN ENTERED INTO BY SELLER, AND (iv) THE PURCHASE PRICE REFLECTS, AND TAKES INTO CONSIDERATION, THE FOREGOING WAIVERS AND DISCLAIMERS.

The above waiver of warranties will be contained in the Act of Sale executed at Closing.

10.    Costs and Fees.  Purchaser shall pay all costs and fees related to its due diligence, survey, appraisal, environmental audits, and the recording of the deed. Seller and Purchaser shall pay the fees of their own attorneys for services related to the preparation and negotiation of this Agreement and the sale and purchase of the Property.  Seller may pay, but shall not be obligated to pay the costs of any title curative work necessary to provide Purchaser merchantable title and the costs of any title policy set forth in Section 13.  Should Seller refuse to pay for such curative work or decline to take the necessary action to make the title merchantable, then Purchaser may, at its own expense make the title merchantable, or alternatively, Purchaser may declare this contract null and void and immediately obtain a refund of its Deposit.

11.    Apportionments.  Ad valorem taxes for the current year shall be prorated as of the Closing Date and shall be paid by Sell and Purchaser when due.  If the current year's assessment is not available at the time of the Closing, the proration shall be based upon the most recent assessment available.  The proration of ad valorem taxes effected at the Closing shall be final and not subject to adjustment after the Closing.

12.    Disclaimer   Purchaser acknowledges and agrees that Seller have not made, do not make and specifically negate and disclaim any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning, or with respect to (i) the value, nature, quality or condition of the Property, including, without limitation, the water, soil and geology, (ii) the income to be derived from the Property, (iii) the suitability of the Property for any and all activities and uses which Purchaser may conduct thereon, (iv) the compliance of or by the Property or its operation with any laws, rules, ordinances or regulations of any applicable governmental authority or body, (v) the habitability, merchantability, marketability, profitability, or fitness for a particular purpose of the Property, (vi) any other matter with respect to the Property, and specifically, that Seller have not made, does not make

and specifically disclaim any representations regarding compliance with any environmental protection, pollution or land uses laws, rules, regulations, orders or requirements, including solid waste, as defined by the U.S. Environmental Protection Agency regulations at 40 C.F.R. Part 261, or the disposal or existence, in or on the Property, of any hazardous substance, as defined by the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and regulations promulgated thereunder.  Purchaser further acknowledges and agrees that having been given the opportunity to inspect the Property, Purchaser is relying solely on its own investigation of the Property and not on any information provided or to be provided by Seller.  Purchaser further acknowledges and agrees that any information provided or to be provided with respect to the Property was obtained from a variety of sources and that Seller have not made any independent investigation or verification of such information and makes no representations as to the accuracy or completeness of such information.  Seller are not liable or bound in any manner by any verbal or written statements, representations or information pertaining to the Property, or the operation thereof, furnished by any real estate broker, agent, employee, servant or other person.  Purchaser further acknowledges and agrees that to the maximum extent permitted by law, the sale of the Property as provided for herein is made on an "AS IS" condition.

13.    <u>Title Work.</u>

At any time prior to the Closing Date, Purchaser may, at its expense, perform a title search. Unless extended by the parties in writing, Purchaser shall notify Seller in writing no later than ten (10) days following the Sale Order, of any objections to Seller's title to the Immovable Property.  Purchaser agrees to accept the Property subject to, and shall not have the right to object to Seller's title on the basis of, the following matters: (i) any lien for the current year's property taxes not yet due and payable; (ii) any recorded or apparent public purpose, access, sewerage, or utility servitude or right-of-way affecting the Property; (iii) any restrictions of record affecting the Property; (iv) any and all discrepancies, conflicts or shortages in area or boundary lines, encroachments, or overlapping of improvements; (v) any and all rights of parties in possession; (v) any building set back line affecting the Property; (vi) any building and zoning ordinances affecting the Property; (vii) riparian rights; and (viii) any mineral lease, mineral servitude, and other mineral right affecting the Property, provided surface rights have been waived.  All objections of which Seller is not timely notified shall be deemed waived and accepted by Purchaser.  In the event Purchaser timely notifies Seller of any objection to Seller's title to the Immovable Property, at Seller's option, (a) this agreement shall be considered immediately null and void and the Deposit shall be returned to Purchaser, or (b) the Closing Date shall be extended by up to sixty (60) days (at Seller's option) to allow Seller the opportunity to perform curative work, or allow Seller to provide Purchaser with a standard ALTA owners title insurance policy through a reputable, national title insurance company acceptable to Purchaser, at Seller's sole cost and expense which does not take an exception for, or provides affirmative coverage over, the title objections raised by Purchaser.  Seller is not obligated to undertake any title curative work.  In the event Seller elects to extend the Closing Date and the title curative work is not completed within the 60-day closing extension period, this agreement shall be null and void and the Deposit shall be returned to Purchaser.  In the event Purchaser timely notifies Seller of any objection to Seller's title to the Property, Purchaser shall have the option and right, prior to the Closing Date, to waive all objections to title and accept title to the Property subject to these objections.

14.     <u>Conditions Precedent to Closing; Maintenance.</u>   The obligations of Purchaser and Seller under this Agreement are subject to all covenants, agreements, actions, proceedings, instruments and documents required pursuant to this Agreement having been performed, complied with or delivered (as the case may be) in accordance with this Agreement. Seller shall continue to maintain the Property prior to Closing.

15.     <u>Documents for Closing.</u>

(a)     Seller, at Seller's sole cost and expense, shall deliver or cause to be delivered to Purchaser the following documents:

(i)     All necessary instruments required in connection with transferring title to the Property to Purchaser to Purchaser; and

(ii)     such additional documents and instruments reasonably required to transfer Seller's interest in the Property pursuant to the terms of this Agreement, each of which shall be in form and substance reasonably satisfactory to the Purchaser; and

(b)     At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller in accordance with the terms of this Agreement, the Purchase Price (subject to a credit for any Deposit delivered to the Seller) and prorations.

16.     <u>Default; Remedies.</u>

a. Seller's Default.  In the event that this Agreement is terminated pursuant to the provisions of Paragraph 5, this shall not constitute a default by Seller, and Purchaser shall be entitled only to a return of the Deposit.  If Seller defaults in any of Seller's other obligations to engage in the closing of the transaction, then provided Purchaser is not in default, Purchaser may, at Purchaser's sole election, by written notice to Seller within ten (10) days after the Closing Date as provided herein, either (i) terminate this Agreement, whereupon the Deposit shall be returned to Purchaser and neither party shall have any further liability or obligation to the other; or (ii) have specific performance of this Agreement.

b.  Purchaser's Default.  If Purchaser defaults hereunder, then, provided Seller is not in default, Seller may, at Seller's sole election terminate this Agreement, whereupon Seller shall be entitled to retain the Deposit, which the parties agree shall be deemed liquidated damages.

c.  If either party fails to comply with all of the terms, covenants and conditions of this Agreement, the prevailing party in any lawsuit will be entitled to all expenses, including a reasonable attorney's fee, incurred as a result of such failure.

17.     <u>Condemnation and Destruction.</u> If, on the Closing Date, all or any reasonably substantial portion of the Property is the subject of a pending or contemplated taking by eminent domain which has not been consummated or if the Property has been materially damaged or destroyed, Seller shall notify Purchaser of such fact and Purchaser shall have the option to terminate this Agreement and, in the event Purchaser shall elect to terminate this Agreement, Seller shall refund to Purchaser the Deposit together with all interest earned thereon.

If this Agreement is terminated and the Deposit together with accrued interest is returned, as aforesaid, neither party shall have any further rights or obligations hereunder.  If, after receipt of Seller's notice, as aforesaid, Purchaser does not exercise its option to terminate this Agreement, the parties hereto shall remain bound hereunder and Seller shall assign and turn over, and Purchaser shall be entitled to receive and keep, all awards for the taking by eminent domain described in said notice or all insurance proceeds payable as a result of such destruction or damage.

18.    <u>Confidentiality</u>.  It is understood by the parties hereto that the information, documents and instruments delivered to Purchaser by Seller and the information, documents and instruments delivered to Seller by Purchaser are of a confidential and proprietary nature. Purchaser agrees that it will maintain the confidentiality of all such confidential information, documents or instruments delivered to it by Seller or its agents in connection with the negotiation of this Agreement or in compliance with the terms, conditions and covenants hereof and only disclose such information, documents and instruments to their duly authorized officers, directors, attorneys, accountants, representatives, and agents.    Upon the Closing, Purchaser's confidentiality covenants shall be terminated.  If the Closing does not occur, then Purchaser's confidentiality obligations shall continue.    Purchaser further agrees that if the transactions contemplated hereby are not consummated, it will return all documents and instruments and all copies thereof in their possession received in association herewith to the Seller.  Purchaser recognizes that any breach of this Section may result in irreparable harm to the Seller and its affiliates and that therefore Purchaser shall be entitled to an injunction to prohibit any such breach or anticipated breach, without the necessity of proving actual damages or posting a bond, cash or otherwise, in addition to all of their other legal and equitable remedies.  Nothing in this Section, however, shall prohibit the use or disclosure of such confidential information, documents or information as are required by law or governmental regulations or to defend itself in a legal proceeding.

18.    <u>Final Agreement.</u> This Agreement represents the final agreement of the parties and no agreements or representations, unless incorporated in this Agreement, shall be binding on any of the parties, and no portion hereof shall be amended or modified unless such change shall be in writing and signed by both parties thereto.

19.    <u>Notice</u>. Any notice required hereunder shall be in writing and sent by certified mail, return receipt requested and/or email. Notice shall be deemed to be given when sent or deposited in the United States mail, postage prepaid.  Personal delivery may be substituted for certified mail. Notice shall be sent to the following individuals:

If To Purchaser:

_____

_____

_____

**If to Seller:**              Great Southern Galvanizing, LLC
P. O. Box 458
Zachary, LA 70791

**With a copy to:**               Paul Douglas Stewart
Stewart Robbins & Brown, LLC
620 Florida St., Suite 100
Baton Rouge, LA  70801
dstewart@stewartrobbins.com

       20.     <u>Number and Gender.</u> Whenever the singular number is used herein and when required by the context, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and the word "person" shall include a corporation, firm, partnership, joint venture, trust or estate.

       21.     <u>Governing Law.</u> This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Louisiana.

       22.     <u>Assignment.</u> This Agreement may not be assigned by Purchaser without the prior written consent of Seller.

       23.     <u>Survival.</u> The representations, warranties and indemnities contained herein shall be deemed to have been made again by the parties as of the Closing Date, and shall survive the expiration or termination of this Agreement, the discharge of all other obligations owed by the parties to each other, and any transfer of title to the Property, and shall not be affected by any investigation by or on behalf of Purchaser, or by any information which Purchaser may have or obtain with respect thereto.

       24.     <u>Severability.</u>  In the event that any condition or covenant herein contained is held to be invalid or void by any court of competent jurisdiction, the same shall be deemed severable from the remainder of this Agreement and shall in no way affect any other covenant or conditions herein contained.  If such condition, covenant or other provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope or breadth permitted by law.

       25.     <u>Waiver and Amendment.</u> No breach of any provision hereof can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision hereof.  This Agreement may be amended only by a written agreement executed by all of the parties hereto.

       26.     <u>Captions and Interpretations.</u> Paragraph titles or captions contained herein are inserted as a matter of convenience and for reference, and in no way define, limit, extend of describe the scope of this Agreement or any provision hereof. No provision in this Agreement is to be interpreted for or against either party because that party or such party's legal representative drafted such provision.

       27.     <u>Brokers.</u>  The parties shall indemnity each other against any and all claims for broker's fees, costs or commissions which might arise in connection with the purchase and sale of the Property as a result of either's action.  The provisions of this Paragraph shall survive closing.  Each party hereby represents to the other that it has not utilized the services of any real

estate agent or broker in connection with this Agreement.

     IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized corporate officers (in counterparts as necessary) as of the date(s) set forth below.

Witnesses:                                        PURCHASER:

_____            [Company Name]

_____            By_____
                                           Name:
                                           Title:
                                           Date:_____

Witnesses:                                        SELLER:

_____            Great Southern Galvanizing, LLC

_____            By_____
                                           Name:
                                           Title:
                                           Date:_____

# EXHIBIT A
## IMMOVABLE PROPERTY

That certain tract or parcel of ground, together with all the buildings and improvements thereon, as well as easements, servitudes and right of ways and all appurtenances thereon, situated in the Parish of East Baton Rouge, State of Louisiana designated as TRACT C-4, and being more particularly described on a map entitled "Map Showing Subdivision of the G.C. Whitaker Property, a 91.483 Acre Tract, into Tract C-3, C-4, & C-5, Located in Section 66, T-5-S, R-1-W, Greensburg Land District, East Baton Rouge Parish, Louisiana, for Land Investments of Louisiana, Inc." by David L. Patterson, Registered Land Surveyor, LandSource, Inc., dated November 14, 2008, last revised January 6, 2009, filed for record in the office of the Clerk and Recorder for the Parish of East Baton Rouge, Louisiana, as Original 208, Bundle 12118 ("Survey"), as shown on said Survey, Tract C-4 fronts on Salvant Road and is located and has such dimensions and measurements as shown on said Survey.

The above described property is a portion of the same property which has been historically described as the Gertrude C. Whitaker Property, a 90.21 Acre Tract, as shown on the "Map Showing a Partition of the Property of J.A. Carruth in the Fourth Ward of East Baton Rouge Parish" dated August 7, 1942 ("Property").

**EXHIBIT B**

**MOVABLE PROPERTY**

## EQUIPMENT LIST

| OPERATIONS BUILDING | | | | |
|---|---|---|---|---|
| KETTLE | 58Lx7Wx8D | | PILLING GALVANIZING KETTLE | 2011 |
| KETTLE (SPARE) | 58Lx7Wx8D | | PILLING GALVANIZING KETTLE | 2015 |
| FURNACE | 65Lx13.5Wx10T | | WESTECH GALVANIZING FURNACE SYSTEM | 2011 |
| | CONTROL PANEL | | | 2011 |
| | 9 - U-FRAMES | | | 2011 |
| | EXHAUST DUCT | | | 2011 |
| | FRESH AIR BLOWER | | | 2011 |
| TANK HEATING | (2) 14Lx3.5Wx6.5T - SKID UNITS | | PUMP, MOTOR, CONTROLS... | 2011 |
| | LOW PRESURE BOILERS (2) | | | 2011 |
| | TEMP CONTROL (6) | | | 2011 |
| | HEATING COILS (8 SETS) | | ZIRCONIUM (ACiD) | 2011 |
| | HEATING COILS (2 SETS) | | TITANIUM (FLUX) | 2011 |
| | HEATING COILS (2 SETS) | | STEEL (CAUSTIC) | 2011 |
| | INSULATED PIPING | | 2 1/2" DIA. STEEL | 2011 |
| HEAT RECOVERY | 1 - 30Lx5Wxs10T - SKID UNIT | | HEAT EXCHANGER, BLOWER, CONTROLS... | 2011 |
| KETTLE COVERS | 3 - 19.7Lx8.5W | | INSULATED KETTLE COVER SECTIONS WITH LIFTING FIXTURES | 2011 |
| PROCESS TANKS | 3 @ 25,000 GAL (60Lx8Wx8T) | | HI-DENSITY COPOLYMER POLYPROPYLENE | 2011 |
| | 3 @ 32,000 GAL (60Lx10Wx8T) | | HI-DENSITY COPOLYMER POLYPROPYLENE | 2-2011, 1-2 |
| | 2 @ 12,000 GAL (53Lx6Wx6T) | | STEEL | 2011 |
| | 1 @ 60Lx8Wx8T) | | STEEL (QUENCH) | 2011 |
| BRIDGE CRANES | 4 - 10-TON GAFFEY BRIDGES | | 74' C/C WHEELS - TOP HUNG / SINGLE GIRT | 2011 |
| | 6 - 5-TON YALE HOISTS | | | 2011 |
| MONORAIL HOISTS | 10 - 5-TON YALE | | | 2011 |
| STORAGE TANKS | 3 @ 12,550 GAL (12DIAx14.8T) | | FRP | 2011 |
| | 1 @ 6,200 GAL (10.2DIAx12.3T) | | 2.2 SPG/XLPE/NAT | 2011 |
| MZR | 1 - METAL ZINC RECOVERY UNIT (MZR) | | 750 KG. CAP. PO39-750-2002 W/ X-TRA DRUMS AND DOOR | 2011 |
| AIR COMPRESSOR | 1 - 267 CFM ELECTRIC COMPRESSOR | | SULLAIR MODEL S-ENERGY 4509 60HP W/660 GAL AIR RECEIVER | 2011 |
| SCALE | 1 - TRUCK SCALE (ABOVE GROUND) | | RICE LAKE ATV-M (10'X10') W/ IQ355 DIGITAL INDICATOR AND REMOTE READOUT AND BEAM MOUNT ASSY. | 2011 |
| FILTER PRESS | 1 - 5 CU FT FILTER PRESS | | HOFFLAND A-5-1.25-4V-CPVC-CGR W/ 17 PLATES (15+HEAD+TAIL) | 2011 |
| DIAPHAM PUMPS | 2 - WILDEN DIAPHRAM PUMPS | | 1 - 1 1/2", 1 - 2" | |
| ZINC DROSS TOOL | 1 - "SHOP BUILT" DROSS SHOVEL | | | |
| TIME CLOCK | | | | 2011 |
| ICE MACHINE | 1 - HOSHIZAKIE ICE MACHINE | | MODEL KM-1300MKF | |
| ABRASIVE SAW | 1 - 22" ABRASIVE CHOP SAW | | 10 HP | 2011 |
| PRESSURE WASHER | 1 - 4200 PSI DEWALT | | | |

C:\Users\Doug Stewart\ND Office Echo\VAULT-dstewart@stewart\Equipment Summaries 4849-3879-4079 v.1.xlsx



| MAINTENANCE DEPARTMENT | | | |
|---|---|---|---|
| STORAGE UNIT | 1 - 40' CARGO CONTAINER | | |
| WELDING MACHINE | 1 - MILLER  WELD MACH W/TRLR | BOB CAT 250 DIESEL | |
| FORKLIFT FORKS | 1 - SET 8' FORKS (NEW) | | |
| BRUSH HOG | 1 - 10' | BRUSH HOG 3210R-2, LIFT TYPE | |
| RAKE | 1 - 6' | TRACTOR-PULL RAKE | |
| PROJECT DEPARTMENT | | | |
| PAINT MACHINE | 1 - GRACO H-XP2 REACTOR | W/ HEATED HOSE, WHIP, TEMP SENSOR, PUMP, GUN.... | |
| AIR COMPRESSOR | 1 - 980 CFM ELECTRIC COMPRESSOR | SULLAIR MOD LS200S-200L AC, DIRECT DRIVE, 200HP W/1550 GAL AIR RECEIVER | |
| OFFICE BUILDING | 1 - METAL BUILDING | | |
| STORAGE CONTAINER | 1 - CARGO CONTAINER | | |
| SANDBLASTING POT | 1 - CLEMCO | SN: 8977 | |
| SAND HOPPER | | | |
| METALIZING EQUIPMENT | 1 - METCO | | |
| GENERATOR | 1 - HONDA 5000X GAS | PORTABLE | |
| RACKING / FIXTURES | | | |
| BOWS | 270 - LIFTING DEVICES | | |
| CHAIN SLINGS | 1/2" | 44 - 10', 70 - 20', 44 - 2' | |
| | 5/8" | 18 - 10' | |
| | 3/4" | 4 - 7' | |
| RACKS | 10 - HOOK RACKS | | |
| | 1 - 20', 1 - 30' UNIVERSAL | | |
| | 3 - 20' LAYDOWN | | |
| | 3 - STANDUP RACKS | | |
| | 19 - DOUBLER HOOKS | | |
| BASKETS | 3 - 4', 3 - 2' | | |
| MAT'L SUPPORTS | 42 - 20' SUPPORTS | "HORSES" | |
| SHACKLES | 62 - MISC | | |
| SPREADER BEAM | 10-TON CAP SPRADER BEAM | | |

| OFFICE EQUIPMENT | | | | |
|---|---|---|---|---|
| | COMPUTERS | 10 - DELL WORK STATIONS | | |
| | COMPUTER NET DRIVE | 1 - HP BACKUP DRIVE | | |
| | ROUTER | 1 - CISCO ISR | | |
| | TELEPHONE SYSTEM | 1 - TOSHIBA STRATA SYSTEM | W/ 8 PHONES | |
| | FAX MACHINE | 1 - BROTHER LASER FAX | INTELLIFAX 2840 | |
| | COPY MACHINE | 1 - COPY MACHINE | COPYSTAR CS4500i | |
| | PRINTERS | 1- LASER, 1-INK JET | KYOCERA EXOSYS P6130cdn, BROTHER HL-L5200DW | |
| | FURNITURE | | | |
| | TIME CLOCK SYSTEM | | | |
| | STORAGE SHED | 1 - METAL BUILDING | | |
| MOTORIZED | | | | |
| | PICKUP TRUCK | 1 - 2014 GMC SIERRA - GREEN | 1/2 TON, SN ....108013 | |
| | PICKUP TRUCK | 1 - 2014 GMC SIERRA - WHITE | 1/2 TON, SN ....559988 | |
| | FORKLIFT (30K) | 4 - HYSTER H300HD2 | | |
| | FORKLIFT (25K) | 5 - HYSTER H250HD2 | | |
| | FORKLIFT (21K) | 1 - HYSTER H210HD2 | | |
| | FORKLIFT (12K) | 1 - HYSTER H80-120FT | | |
| | AERIAL LIFT (60') | 1 - JLG 860SG MANLIFT | | |
| | TRACTOR | 1 - 2016 JOHN DEERE | 5085E W/ H240 LOADER | |
| TRAILERS | | | | |
| | FLATBEDS | 25 @ 48' - 2009 GREAT DANE | | |
| NATURAL GAS SUB-STATION | | | | |
| | | 30'x30' METER PAD | | |
| | | SKID-MOUNT 2" METER & REGULATOR | | |
| | | ODORIZER | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**EXHIBIT C**

**AUCTION PROCEDURES**

1.      Unless otherwise ordered by the Court, the following procedures (the "Auction

Procedures") shall govern the bidding and sale of the Debtor's assets:

a.  Due Diligence.  Upon execution of a confidentiality agreement, any prospective
bidder that wishes to investigate the Debtor's assets shall be granted access to all
material information provided for prospective bidders.  The due diligence period for
bidders will end at five o'clock p.m. (5 p.m.) central time one business day prior to
the Bid Deadline (as defined in this order).  The Debtor shall coordinate all
reasonable requests for additional information and access from potential bidders.  No
conditions relating to the completion of due diligence shall be permitted to exist after
the Bid Deadline.  The Purchased Assets shall be sold on an "as is, where is" basis
and by submitting a bid, each potential bidder so acknowledges.

b.  Qualified Bids.  In order to be eligible to participate in an auction of the Debtor's
assets, each potential bidder shall, on or before June 8, 2018, (the "Bid Deadline"),
deliver a bid to the Debtor's counsel via email to Paul Douglas Stewart, Jr.,
dstewart@stewartrobbins.com, and to counsel for Iberiabank, via email to Craig A.
Ryan, ryanc@onebane.com, that shall be considered a qualified bid (a "Qualified
Bid") if the bidder (a "Qualified Bidder") complies with, and such Qualified Bid
contains all, of the following:

i.  If not previously completed, an executed confidentiality agreement in a form
reasonably satisfactory to the Debtor, which shall include appropriate and
customary protections associated with confidential and proprietary
information;

ii.  A cash deposit of $50,000.00 (the "Deposit"), which will be held by the
Debtor's counsel in its client trust account with no interest due to the bidder,
as a refundable deposit for application against the purchase price at the closing
of the transaction, or to be returned to the bidder within five (5) business days
following conclusion of the auction, unless the bidder is the highest and best
bidder (the "Successful Bidder") or the next highest and best bidder (the
"Backup Bidder"), whose Deposits shall be held as set forth below;

iii.  An executed asset purchase agreement either (i) in the form attached to this
order as Exhibit "A" or (ii) in a different form which must be marked against
the suggested form, showing amendments and other modifications (including
price and other terms) proposed (the "Asset Purchase Agreement") which
must:

1.  specify the amount of cash offered by the bidder for the Purchased
Assets;

2. specify which of the Purchased Assets the bidder desires to bid upon;

3. constitute an irrevocable offer by the bidder (a) to complete its proposed purchase upon its terms, and (b) to remain irrevocable until the closing of the Sale of the Purchased Assets;

4. include documentation demonstrating the authority of the bidder to submit an offer to purchase the Purchased Assets that identifies the officer(s) or authorized agent(s) appearing on behalf of the bidder;

5. include information demonstrating that the bidder has the financial wherewithal to close the transaction; and

6. acknowledge that it will not be entitled to a break-up fee, termination fee, expenses, or substantial contribution claim of any type; and

7. contain such other information reasonably requested by the Debtor.

iv. Those parties that submit the information required above will be notified within 24 hours as to whether the information submitted is satisfactory and whether the party is now a Qualified Bidder.  If the Debtor or Iberiabank is not satisfied with the information received from the interested party, the Debtor may seek further information to qualify the party as a Qualified Bidder.

c. Qualified Bidders.  The Debtor, in consultation with Iberiabank, shall determine whether a bid qualifies as a Qualified Bid.  Subject to the reservation of credit bid rights in subparagraph (j) of this Section 3, unless otherwise decided by the Debtor and Iberiabank, only those persons (other than Iberiabank) who have submitted a Qualified Bid in compliance with this Auction Procedures Order shall be a Qualified Bidder. Iberiabank shall be deemed a Qualified Bidder for all purposes hereunder and shall not be required to comply with the provisions of subparagraph b hereinabove. Iberiabank and/or any party who has credit bid rights under subparagraph (j) is not required to submit a bid before the Bid deadline and Iberiabank and/or such entity or person having rights under subparagraph (j) of this Section 3 shall have the right to submit a credit bid at the Auction, which shall be deemed equivalent to a cash bid. In the event that Iberiabank is the Successful Bidder,  Iberiabank and shall retain any and all rights and claims it has or may have against the Debtor, any guarantor or any remaining collateral with respect to amounts owed to Iberiabank after application of the sale proceeds (or the credit bid amount) to Iberiabank's claim, including the right to pursue any guarantor on the deficiency and / or the right to file an amended proof of claim into this bankruptcy case.

d. One Qualified Bid.  In the event the Debtor only receives a single Qualified Bid and Iberiabank does not credit bid at the Auction Date / Sale Hearing, there shall be no auction and at the Sale Hearing the Debtor shall request that the Bankruptcy Court

approve the Sale of the Purchased Assets to the Qualified Bidder through the Sale Order and rule that the Sale Order be immediately effective upon entry.

e. The Auction. In the event the Debtor receives one or more Qualified Bids and / or Iberiabank places a credit bid at the Auction, an Auction shall commence June 18, 2018, at 2:00 p.m., in open court. Each Qualified Bidder (including Iberiabank, if applicable) shall be invited to attend the Auction which must be attended in person. The following rules shall govern the Auction:

  i. Subject to the limitations set forth in these Auction Procedures, the opening price at such Auction shall be the highest and/or best offer of a Qualified Bidder selected and announced by the Debtor at the commencement of the Auction;

  ii. Only Qualified Bidders may bid at the Auction. If multiple Qualified Bids are received, each Qualified Bidder shall have the right to continue to improve its Qualified Bid at the Auction;

  iii. Each subsequent overbid must provide an incremental amount designated by the Debtor;

  iv. Each bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction;

  v. The Auction shall be conducted openly, and each bidder will be informed of the terms of the previous bid determined by the Debtor and Iberiabank to have been the highest and otherwise best bid;

  vi. At the conclusion of the Auction and subject to Court approval following the Auction, the Debtor shall announce as the highest or otherwise best bid for the Purchased Assets the Successful Bidder as well as the second highest or otherwise best bid for the Purchased Assets, the Backup Bidder;

  vii. The Auction may be adjourned by the Debtor and Iberiabank from time to time without further notice other than an announcement of such adjournment by the Debtor at the Auction;

  viii. Upon the conclusion of the Auction, the Debtor will request that the Court enter the Sale Order approving the sale of the Purchased Assets to the Successful Bidder, or, should the Successful Bidder fail to close the sale, the Backup Bidder; free and clear of all liens, claims and encumbrances to the fullest extent allowed under section 363(f) of the Bankruptcy Code; and

  ix. Notwithstanding the foregoing, the Debtor may, with the concurrence of Iberiabank, promulgate such additional rules for the Auction as the Debtor, in its reasonable discretion, deems to be in the best interests of the Debtor's estate.

f.   Successful Bidder.  The Debtor, in consultation with Iberiabank, shall select the highest and best bid as the Successful Bidder. The Debtor and / or Iberiabank may (a) reject any bid that is (i) inadequate or insufficient , (ii) not in conformity with the requirements of the Bankruptcy Code, the Auction Procedures or the terms and conditions of sale, or (iii) contrary to the best interests of Debtor, its estate and creditors, and (b) refuse to consider any bid that fails to comply with the Auction Procedures. After the determination of the Successful Bidder, the Debtor shall promptly execute the asset purchase agreement previously executed and submitted by such Successful Bidder, together with any changes thereto necessitated by the parties' actions at the Auction.

g.   Backup Bidder.  If the Successful Bidder fails to consummate the sale, breaches the asset purchase agreement executed by the Successful Bidder or otherwise fails to perform, (a) the Debtor may consummate the proposed sale with the next highest or best bidder at the Auction (i.e., the Backup Bidder), without the need for further Court approval, (b) the Debtor will retain the Deposit of such bidder, and (c) the Debtor will maintain the right to pursue all available remedies against the Successful and Backup Bidders.

h.   Purchase by Iberiabank. In the event that no Qualified Bids are received by the Bid Deadline; or if the Successful Bidder and the Backup Bidder (if applicable) shall fail to consummate the proposed sale as provided for hereinabove, the Debtor may consummate the proposed sale to Iberiabank, and any other entity having rights to credit bid for certain assets as reserved under subparagraph (j) of this Section 3, pursuant to credit bid with the credit amount or purchase price of the Purchased Assets to be agreed upon at the Sale Hearing, and with the Debtor maintaining the right to pursue all available remedies against the Successful and Backup Bidders. Iberiabank shall retain any and all rights and claims it has or may have against the Debtor, any guarantor or any remaining collateral with respect to amounts owed to Iberiabank after application of the sale proceeds (or the credit bid amount) to Iberiabank's claim, including the right to pursue any guarantor on the deficiency and / or the right to file an amended proof of claim into this bankruptcy case.

i.   Deposits.  All Deposits (without interest) shall be returned to each bidder not selected by the Debtor as the Successful Bidder or Backup Bidder no later than five (5) business days following the conclusion of the Auction.  The Deposit (without interest) of the Backup Bidder shall be returned to the Backup Bidder no later than 72 hours after the closing of the transaction.  If the Successful Bidder timely closes the transaction (within 15 days after the Sale Hearing unless extended by consent of the Debtor and Iberiabank), its Deposit (without interest shall be credited towards the Purchase Price.  If the Successful Bidder fails to timely close the transaction, and the Purchased Assets are sold to the Backup Bidder, such Backup Bidder's Deposit (without interest shall be credited towards the Purchase Price.

j.   Credit Bid.  Credit Bidding is allowed for secured creditors with claims allowed under Bankruptcy Code section 502. Putative creditors Hobson Galvanizing, Inc., Westside Galvanizing Services, Inc. and AZZ Inc. will not be allowed to credit bid

their recorded judgment as an adversary proceeding has been filed to avoid the recordation and perfection of their judicial lien.

k. Exercise of Iberiabank's Section 363(f) Objection Right.  Iberiabank must declare whether it objects to this sale under Section 363(f) (i) immediately upon the conclusion of the Auction, if any, or (ii) within four (4) hours of the Bid Deadline if only one (1) bid is received.  If Iberiabank declares that it objects to this sale under Section 363(f), (i) the Sale Motion will be continued for fourteen (14) days in order to allow any party in interest to seek to have the sale approved over Iberiabank's objection and (ii) such parties shall have (7) days to file a pleading seeking such relief.  Absent such a filing, the sale hearing will be cancelled.

l. Fees and Expenses.  All bidders submitting bids shall bear their own fees and expenses in connection with the bid, the bid process, the Auction and the proposed sale, whether or not such sale is ultimately approved, unless otherwise agreed to by the Debtor and approved by the Court.

2.    The hearing on the sale (the "Sale Hearing") shall be held on June 18, 2018, at 2:00 p.m. (Central Time), or as soon thereafter as counsel may be heard, before the Honorable Douglas D. Dodd, United States Bankruptcy Judge for the Middle District of Louisiana.  At the Sale Hearing, the Debtor will seek entry of the Sale Order.  The Sale Hearing may be adjourned from time to time without further notice other than an announcement by the Debtor in Court on the date scheduled for the Sale Hearing.

3.    The form of notices attached to this order as exhibits B and C are approved.  The Debtor shall serve conformed notices within two (2) business days (by first class mail, postage prepaid) after entry of this order on the following parties: (i) all parties on the Debtor's mailing list, (ii) all parties having requested notice, (iii) counsel to any official committee, (iv) the Office of the United States Trustee, (v) counsel to all secured lenders, (vi) all parties that assert a lien or other encumbrance against any of the assets noticed for sale, (vii) all parties to executory contracts and unexpired leases proposed to be assumed and assigned, or rejected, as part of the proposed transaction, and (viii) all entities known or reasonably believed to have expressed an interest in acquiring any of the assets offered for sale.

4.      Responses or objections, if any, to the entry of the Sale Order shall be filed with this Court as required by local rule.

5.      The following Assignment Procedures shall govern the assumption and assignment of executory contracts and leases in connection with the sale to the Successful Bidder:

> i.   Not later than fourteen (14) days prior to the Sale Hearing, the Debtor shall file with the Court a list (the "Cure Schedule") identifying such contracts and leases which may be assumed in connection with the sale and the amounts necessary to cure defaults and/or provide compensation or adequate assurance of compensation for actual pecuniary loss resulting from a default at the time of assumption as determined by the Debtor (such amounts, "Cure Payment Liability").  The Debtor shall serve all counterparties to such contracts and leases with the Assignment Notice, specifically stating that the Debtor is or may be seeking the sale, assumption and assignment of such contracts and leases and notifying such parties of the deadline for objecting (a "Cure/Assignment Objection") to the amount of any related Cure Payment Liability, which deadline shall be three (3) business days prior to the Sale Hearing, so as to enable any such party to object to the proposed Cure Payment Liability and the Court to determine such Cure Payment Liability as promptly as is reasonably possible.

> ii.  In cases in which the Debtor is unable to establish that a default exists, the relevant Cure Payment Liability shall be set at $0.00 in the Assignment Notice.

> iii. Notwithstanding anything herein to the contrary, the Debtor may, from time to time, modify the Cure Schedule to add or remove a contract or lease counterparty or to modify the proposed Cure Payment Liability with respect to any counterparty.  The non-debtor counterparty to any such contract or lease will be provided written notice of any such modification and at least fourteen (14) days advance notice of its deadline to object to such modification, and the Debtor will seek to set any such objection for hearing before the Court as promptly as is reasonably possible.

# EXHIBIT B – AUCTION PROCEDURES ORDER

## SALE NOTICE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Great Southern Galvanizing, LLC | ) | Case No. 18-10259 |
| d/b/a Great States Galvanizing, | ) | |
| | ) | |
| Debtor . | ) | |
| | ) | |

NOTICE OF (I) PROPOSED SALE OF THE ASSETS OF GREAT SOUTHERN
GALVANIZING, LLC D/B/A GREAT STATES GALVANIZING FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES,
(II) BID PROCEDURES AND (III) AUCTION RELATED THERETO

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      On March 14, 2018, the Debtor filed with the Court a motion [Docket No. 7] (the "Sale Motion") seeking, among other things: (a) authority to sell the assets of the Debtor free and clear of all liens, claims, interests and encumbrances (the "Sale"); (b) approval of certain procedures (the "Auction Procedures") for the solicitation of bids with respect to the Sale; (c) approval of certain procedures (the "Assignment Procedures") in connection with the identification and assumption of certain contracts and leases in connection with the Sale; and (d) scheduling an auction (the "Auction") and a final hearing with the Court for approval of the Sale (the "Sale Hearing").

2.      The Debtor filed that certain form of Asset Purchase Agreement (including all exhibits, schedules and ancillary agreements related thereto, the "Asset Purchase Agreement"), which contemplates the sale of the Seller's assets (the "Purchased Assets"), through the Auction.

3.      A hearing on the Auction Procedures was held before the Court on April 9, 2018 and thereafter the Court entered an Order, among other things, approving the Auction Procedures [Docket No. [••]] (the "Auction Procedures Order").  The Auction Procedures Order establishes the Auction Procedures that govern the manner in which the Purchased Assets are to be sold.  All bidders must comply with the Auction Procedures and submit a Qualified Bid so as to be received not later than June 8, 2018.

5.      Pursuant to the Auction Procedures, each Qualified Bidder (as defined in the Auction Procedures) shall be invited to participate in the Auction in open court, which Auction must be attended in person and which shall commence at 2:00 p.m. (prevailing Central Time) on June 18, 2018.

6.      The Sale Hearing currently is also scheduled to be conducted at 2:00 p.m. (prevailing Central Time) on June 18, 2018 before the Honorable Douglas D. Dodd, United States Bankruptcy Judge for the Middle District of Louisiana, to consider the approval the

highest and best offer by a Qualified Bidder (the "Successful Bidder"), the second highest or best
offer by a Qualified Bidder (the "Backup Bidder") and of the Agreement (as modified by the
Successful Bidder) and seeking entry of an order approving the Sale (the "Sale Order").  The
Sale Hearing may be adjourned or rescheduled from time to time without further notice other
than an announcement by the Debtor in the Court of such adjournment on the date scheduled for
the Sale Hearing.

7.       A copy of the Auction Procedures Order, the proposed Asset Purchase Agreement
(attached to the Auction Procedures Order as Exhibit "A") and the Sale Motion (including the
proposed Sale Order) may be obtained by sending a written request to counsel for the Debtor,
Stewart Robbins & Brown LLC, 301 Main Street, Suite 1640, Baton Rouge, LA  70801 (Attn:
Paul Douglas Stewart, Jr., dstewart@stewartrobbins.com).

9.       OBJECTIONS TO ENTRY OF THE SALE ORDER (OTHER THAN THE
PROPOSED ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND
LEASES OR TO ANY PROPOSED CURE PAYMENT LIABILITY AMOUNTS IN
CONNECTION THEREWITH), INCLUDING THE TRSUTEE'S REQUEST TO APPROVE
THE SALE OF THE PURCHASED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS TO PURCHASER (AS DEFINED IN THE
AGREEMENT) OR ANOTHER SUCCESSFUL BIDDER (EACH, AN "OBJECTION"),
MUST BE MADE IN WRITING AND FILED AS PER THE LOCAL RULES.

10.      The Auction Procedures Order approves the Assignment Procedures, which set
forth: (i) the manner in which the Debtor will (a) identify the Assumed Contracts and the
Assumed Leases (each as defined in the Sale Motion), and (b) identify amounts the Debtor
believes are necessary to cure defaults under each of such Assumed Contracts and Assumed
Leases as determined by the Debtor; and (ii) procedures to be followed by any party that wishes
to object to the proposed assumption and assignment of any Assumed Contract and Assumed
Lease, or the cure amounts proposed by the Debtor in respect thereof.  An additional notice
setting forth the specific Assumed Contracts and Assumed Leases to be assumed by the Debtor
and the proposed cure amounts for such contracts will be served upon all counterparties to the
Assumed Contracts and Assumed Leases.

11.      The failure of any person or entity to file an objection on or before the Objection
Deadline shall be deemed a consent to the Sale of the Purchased Assets to the Successful Bidder
and the other relief requested in the Sale Motion and be a bar to the assertion, at the
Confirmation Hearing or thereafter, of any objection to the Auction Procedures, the Sale Motion,
the Auction, the sale of the Purchased Assets, the Debtor's consummation and performance of
the Agreement (or marked-up agreement) with the Successful Bidder (including in any such
case, without limitation, the transfer of the Purchased Assets free and clear of all liens, claims,
encumbrances and interests).

12.      This Notice is subject to the full terms and conditions of the Sale Motion, the
Auction Procedures Order and the Auction Procedures, which shall control in the event of any
conflict.  The Debtor encourages parties in interest to review such documents in their entirety
and consult an attorney if they have questions or want advice.

Dated:                          [••], 201[••].

Paul Douglas Stewart, Jr.
Stewart Robbins & Brown LLC
301 Main Street, Suite 1640
Baton Rouge, LA  70801
Email: dstewart@stewartrobbins.com
main 225.231.9998
efax 225.784.9175

# EXHIBIT C – AUCTION PROCEDURES ORDER

# ASSIGNMENT NOTICE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Great Southern Galvanizing, LLC | ) | Case No. 18-10259 |
| d/b/a Great States Galvanizing, | ) | |
| | ) | |
| Debtor . | ) | |
| | ) | |

NOTICE OF DEBTOR'S INTENT TO ASSUME AND ASSIGN
CERTAIN CONTRACTS AND LEASES OF GREAT SOUTHERN GALVANIZING, LLC
D/B/A GREAT STATES GALVANIZING

PLEASE TAKE NOTICE THAT on March 14, 2018, the Debtor filed a motion [Docket No. 7] (the "Motion") with the Court seeking, among other things, approval of certain procedures (the "Assignment Procedures") applicable to the identification and assumption of certain contracts (the "Assumed Contracts") and leases (the "Assumed Leases"), and assignment thereof, in connection with the Sale by which the Debtor intends to sell its assets.

PLEASE TAKE FURTHER NOTICE THAT on [••], 201[••], the Court entered an order (the "Order") granting the Motion as set forth therein [Docket No. [••]] and approving the procedures for the assumption and assignment of the Assumed Contracts and Assumed Leases.

PLEASE TAKE FURTHER NOTICE THAT the Debtor may assume and assign to the Successful Bidder the Assumed Contracts and Assumed Leases listed on Exhibit "1" annexed hereto pursuant to section 365 of the Bankruptcy Code at the hearing that is scheduled to be conducted on [••], 201[••] at [••]:00 [•].m. (prevailing Central Time) before the Honorable Douglas D. Dodd, United States Bankruptcy Judge for the Middle District of Louisiana.

PLEASE TAKE FURTHER NOTICE THAT the Debtor has set forth on Exhibit "1" hereto (the "Cure Schedule") the amounts due and owing, if any, under the Assumed Contracts and Assumed Leases through the date hereof (the "Cure Amounts"). The Bankruptcy Code requires that the Cure Amounts (which include any amounts owing on account of the Debtor's obligations under the Assumed Contracts and Assumed Leases as of the date of assumption) be paid in full to the parties owed such amounts upon the Debtor's assumption of the Assumed Contracts and Assumed Leases.

PLEASE TAKE FURTHER NOTICE THAT ANY PARTY SEEKING TO ASSERT AN OBJECTION TO THE ASSUMPTION BY THE TRUSTEE AND ASSIGNMENT TO PURCHASER OF ANY CONTRACT OR LEASE, INCLUDING AS TO THE VALIDITY OF ANY CURE AMOUNT AS DETERMINED BY THE DEBTOR OR TO OTHERWISE ASSERT THAT ANY OTHER AMOUNTS, DEFAULTS, CONDITIONS OR PECUNIARY LOSSES MUST BE CURED OR SATISFIED UNDER THE ASSUMED CONTRACTS AND ASSUMED LEASES (NOT INCLUDING ACCRUED BUT NOT YET DUE OBLIGATIONS) MUST FILE ITS OBJECTION (ANY SUCH OBJECTION, AN "ASSUMPTION OBJECTION") SETTING FORTH WITH SPECIFICITY ANY AND ALL CURE OBLIGATIONS OR OTHER CONDITIONS WHICH SUCH PARTY ASSERTS MUST BE CURED OR SATISFIED WITH RESPECT TO SUCH CONTRACT, LEASE OR INTELLECTUAL PROPERTY RIGHT BY [••], 201[••] (THE "OBJECTION DEADLINE").

PLEASE TAKE FURTHER NOTICE THAT Assumption Objections must set forth the cure amount or other obligation the objecting party asserts is due, the specific types and dates of the alleged defaults, pecuniary losses and conditions to assignment and the support therefor, if any.

PLEASE TAKE FURTHER NOTICE THAT if, as to any Assumed Contract, or Assumed Lease, no Assumption Objection is received by the Objection Deadline, such Assumed Contract or Assumed Lease shall be deemed assumed by the Debtor and assigned to Successful Bidder without further order of the Court, effective as of the later of (i) the Objection Deadline, (ii) the payment of the applicable Cure Amount, if any, set forth in Exhibit "1" hereto or (iii) the date specified in the Agreement.  If an Assumption Objection is received by the Objection Deadline and the Debtor and/or the Successful Bidder are unable to resolve such objection consensually, the proposed assumption and assignment which is the subject of such Assumption Objection shall be subject to further order of the Court and the Debtor and/or the Successful Bidder shall promptly schedule a hearing to consider such Assumption Objection.

PLEASE TAKE FURTHER NOTICE THAT hearings with respect to Assumption Objections shall be held on such date as the Court may designate.

PLEASE TAKE FURTHER NOTICE THAT the Debtor may, from time to time, modify the Cure Schedule to add or remove a contract or lease counterparty or to modify the proposed Cure Amount with respect to any counterparty.  The non-trustee counterparty to any such contract or lease will be provided separate written notice of any such modification and at least fourteen (14) days advance notice of its deadline to object to such modification, and the Debtor will seek to set any such objection for hearing before the Court as promptly as is reasonably possible.

PLEASE TAKE FURTHER NOTICE THAT IF YOU AGREE WITH THE CURE AMOUNTS SET FORTH ON EXHIBIT "1" AND DO NOT OTHERWISE OBJECT TO THE DEBTOR'S ASSUMPTION AND ASSIGNMENT OF YOUR CONTRACT OR LEASE YOU NEED NOT TAKE ANY FURTHER ACTION.

PLEASE TAKE FURTHER NOTICE THAT a complete copy of the pleadings and orders described in this motion may be obtained by sending a written request to counsel to the Debtor, below.

Dated:                    [••], 201[••].

Paul Douglas Stewart, Jr.
Stewart Robbins & Brown LLC
301 Main Street, Suite 1640
Baton Rouge, LA  70801
Email: dstewart@stewartrobbins.com
main 225.231.9998
efax 225.784.9175

EXHIBIT 1
TO NOTICE OF DEBTOR'S INTENT
TO ASSUME AND ASSIGN
CERTAIN CONTRACTS AND LEASES

| Description of Contract | Cure Amount | Counterparties |
|---|---|---|
|  |  |  |

[To be supplemented as necessary prior to actual notice]